## INTERSTATE TRANSIT LINES v. UNITED STATES.
### Civ. No. 240.

District Court, D. Nebraska, Omaha Division.

May 12, 1943.

T. W. Bockes and C. B. Matthai, both of Omaha, Neb., Thomas F. Hamer, of Kearney, Neb., and F. J. Melia, of Omaha, Neb., for plaintiff.

Joseph T. Votava, U. S. Atty., and Alvin J. Rockwell and Andrew D. Sharpe, Sp. Assts. to Atty. Gen., and Samuel O. Clark, Jr., Asst. Atty. Gen., for defendant.

DONOHOE, District Judge.

The plaintiff, Interstate Transit Lines, a corporation organized under the laws of the State of Nebraska, brings this suit for a recovery of taxes amounting to $7,835.35 and interest of $1,423.23, paid by the plaintiff under the Carriers' Taxing Act, U.S. C.A. Title 45, Sec. 261–273, 26 U.S.C.A. Int.Rev.Code, § 1500 et seq., with respect to the first quarter of the year 1937. Of the sum of $7,835.35, $3,918.17 was paid as employers' taxes under section 3 of the act, and $3,917.18 was paid as employees' taxes under section 2. The sum of $1,423.23 was interest taxed by the Collector of Internal Revenue and paid by the plaintiff on November 18, 1941.

The contention of the plaintiff is that the assessment of said taxes was erroneous in that the plaintiff does not come within the provisions of the Carriers' Taxing Act of 1937. The State Labor Commissioner of the State of Kansas, the Unemployment Compensation Commission of Missouri, the Employment Security Commission of Wyoming, and the State of Illinois, each, with leave of Court, filed briefs as amici curiæ.

The case involves a construction and application of Section 1(a) of the Carriers' Taxing Act of 1937, 26 U.S.C.A. Int.Rev. Code § 1532(a), the material part of which reads as follows:

"The term 'employer' means any carrier (as defined in subsection (h) of this section), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing,

storage, or handling of property transported by railroad. * * *

"The term 'employer' shall also include railroad associations, traffic associations, tariff bureaus, demurrage bureaus, weighing and inspection bureaus, collection agencies and other associations, bureaus, agencies, or organizations controlled and maintained wholly or principally by two or more employers as hereinbefore defined and engaged in the performance of services in connection with or incidental to railroad transportation." Section 1(h) of the Carriers' Taxing Act, 26 U.S.C.A. Internal Revenue Code, § 1532 (h). The term "carrier" is defined as follows: "The term 'carrier' means an express company, sleeping-car company or carrier by railroad, subject to part I of the Interstate Commerce Act."

The definite question which is presented is whether plaintiff is an "employer" as that word is defined in the Carriers' Taxing Act. The question will be solved by a determination of (1) the meaning of the word "employer" as the word is used in the act, and (2) the nature of the business transacted by the plaintiff.

An extended hearing was had by the Court, at which a great volume of evidence was received. Extensive oral arguments were had, and well considered and carefully prepared briefs have been filed and studied. It will not be my purpose to set forth in this memorandum specific findings of fact, but I shall merely state here my general conclusions from the evidence, and I shall request counsel to prepare and submit for approval specific findings in support of my general conclusions.

It is a matter of general knowledge that back in the early nineteen twenties, there was general confusion in the transportation business due to the advent of motor conveyances. The automobile was coming into general use. Many new owners took to the business of transportation of passengers for hire, either intermittently or continuously, without any idea, experience, or knowledge of the cost of such transportation. These operators naturally took to the better highways, which extended from village to town, and from town to city, and in nearly every instance such highways paralleled the railroad lines along which such villages, towns and cities were built. When the highways became hard-surfaced and extended, as occurred, there emerged from the melee more substantial operators, who were pioneers in

organizing, operating and extending the bus lines. Among these, according to the evidence, were the Interstate Transit, the Pickwick and the Greyhound Lines, which were operating in the territory served by the Union Pacific and the Chicago and Northwestern Railroads.

The growth of these bus lines was somewhat slow, but was threatening. It was then that the railroad officers and operators realized that if the railroads were to protect their transportation business from that source of competition, and if the so-called "fly by night" operators were to be retired from the business, it was necessary for the railroads to engage in the business of transportation by bus.

It was with these considerations in mind, according to the evidence, that the negotiations were entered into with the stockholders of the plaintiff for the purchase of the stock, which resulted in the acquiring of the entire capital stock of the plaintiff by the Union Pacific and the Chicago and Northwestern Railroads. That the railroads expected to derive some advantage or profit from the investment may not be gainsaid. If it were not so, the investment would not have been made.

After the acquiring of the capital stock, the bus line was reorganized and extended on a business basis. Large commodious busses were put in operation on regular schedules. Comforts and facilities for travel by bus were furnished, and as a consequence the bus lines have eliminated the smaller operators, and the entire transportation system has become stabilized.

The railroads are not concerned about the revenue earned, or competition of the bus system, because any revenue derived therefrom ultimately comes to the treasury of the railroads.

We hold therefore that the bus service, in which plaintiff is engaged, is service in connection with the transportation of passengers or property by bus, rather than by railroad, and that any contact, connection or interchange of service between the railroads and the plaintiff are mere incidents to their business, and such as are practiced and engaged in by other lines of transportation. Having arrived at this conclusion, it is a simple matter to apply the law. The Act of Congress is simple in language and should be easily and readily understood. The meaning of the word "employer", as the

word is used in the act, is defined, and this word pertains only in connection with the transportation of passengers or property by railroad, within the meaning of Section 1(a) of the Carriers' Taxing Act of 1937.

We think the language of the act is sufficiently clear to indicate the intention of Congress to exclude the plaintiff and all other similar bus lines from the operation of the act, but notwithstanding the record abounds with evidence of the deliberations of the Congress leading up to the passage of the act, and if such proceedings are to be resorted to as an aid in interpreting the law, then we may say from these proceedings it can only be concluded that motor bus transportation was excluded from the act deliberately, purposefully and intentionally. Numerous decisions of the Department have been cited. These decisions can hardly be considered as authority, since they have not been long continued, nor are they uniform. United States v. Hill, 120 U.S. 169, 7 S.Ct. 510, 30 L.Ed. 627.

There is but one decision cited in which this precise question was involved and determined, and I know of no other. The case is from the United States Circuit Court of Appeals for the Fifth Circuit, and is Allen v. Ocean S. S. Co. of Savannah, 123 F.2d 469. That case involved a steamship company engaged in the transportation of passengers and property by boat. Aside from the means of transportation, the facts are in all respects almost identical with the facts in this case. The District Court, in an opinion, reported in 36 F.Supp. 851, held that the steamship company did not come within the meaning of the term "employer", as used in the Carriers' Taxing Act of 1937. An appeal was prosecuted to the Circuit Court, and there the decision of the District Court was affirmed. I quote the following from the opinion that is equally applicable here [123 F.2d 471]:

"It is quite apparent that the construction appellant contends for will result in cutting across industrial lines and in absorbing into the special railroad insurance system, some parts of other industries because those parts happen to be owned by railroads, while that for which appellee contends, will have no such effect. That consideration alone should, we think, give us pause in construing, indeed should prevent our construing the act as appellant does, unless its language does not reasonably admit of any other result.

"Certainly the Congressional intent to include water carriers cannot be drawn from the fact, if it be a fact, which appellant makes so much of, that water carriers, in addition to performing purely steamship services, perform for a charge and for themselves, transportation service which the railroad carriers could have undertaken but left to the water carriers to perform. For, if this were the simple criterion, Congress could easily and would have said so, instead, as it did, of confining the application of the act to rail carriers and companies owned by them which performed a part of their transportation service for them. Appellant realizing this difficulty, in the way of his construction, devotes a good part of his brief to arguing that the services performed by appellee are performed not for itself but as agent for railroad carriers. But on the record this will not at all do. Not a word of it in the slightest tends to support this view. All of it leads directly to the contrary conclusion."

Counsel for the government concede that this case is directly in point, but maintain that the case was wrongly decided, and should not be followed in the Eighth Circuit, since it is not binding upon us, and may merely be considered, if at all, as persuasive. We think the Ocean Steamship case is more than persuasive. It is the only decision of a higher court directly on the question involved. It is well considered. We think it is sound, and it will be followed in this case.

Judgment will therefore be entered in favor of the plaintiff and against the defendant in the sum of $7,835.35, the amount of taxes paid, together with interest paid thereon in the sum of $1,423.23, together with interest on the amount paid from the date of the payments by plaintiff up to the present date.

Counsel for the plaintiff are requested to prepare specific findings of fact and conclusions of law from the evidence supporting the conclusions herein expressed, such findings and conclusions to be submitted to the Court for approval. Counsel for plaintiff will also compute the amount due in keeping with this memorandum, and submit at the same time for approval a proposed Journal Entry of the judgment.