## PACIFIC ELECTRIC RY. CO. v. UNITED STATES.

### Civil Action No. 3537.

District Court, S. D. California,
Central Division.

May 9, 1945.

E. L. H. Bissinger, of Los Angeles, Cal., for plaintiff.

Charles H. Carr, U. S. Atty., by George M. Bryant, Asst. U. S. Atty., both of Los Angeles, Cal., for defendant.

McCORMICK, District Judge.

This action concerns a social security tax. It is brought by the Pacific Electric Railway to recover taxes paid to the United States on one-half of the salaries of the employees of the Los Angeles Motor Coach Lines pursuant to the provisions of the statute, found in 26 U.S.C.A. Int.Rev.Code, § 1532. The controversy is essentially one to establish conflicting claims to jurisdiction, and concurrently, the differences of opinion between the agents or administrator of the Railroad Unemployment Insurance Commission and the California Employment Commission.

The statute which is involved in the controversy, in so far as it is pertinent to our problem, is found in subdivision (a) and subdivision (g), Section 1532, in 26 U.S.C.A. Int.Rev.Code, as I have already mentioned. Subdivision (a) states:

"The term 'employer' means any carrier * * *, and any *company* which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service * * * in connection with the transportation of passengers or property by railroad. * * *." (Italics supplied.)

Subdivision (g) of that same statute, in so far as it is applicable to our problem, states:

"The term 'company' includes corporations, associations, and joint-stock companies."

I do not believe it necessary to detail at this time the factual situation found in the record of the action. There does not seem to be any dispute between the litigants as to the factual situation. Most of the facts have been stipulated to, and others were such as were presented by documentary evidence offered at the hearing of the case on the merits, and in my opinion there is not any real dispute as to the factual matters. It is more as to the construction to be placed upon the facts; in other words, the legal conclusion that is properly to be drawn from the admitted and stipulated facts, so that I shall not recite those in full.

Preliminarily, I think it is essential to an understanding of the issues, and of the proper construction of the statute, to comprehend the relation of what I might term as railroad social security legislation to other social security legislation, because, as I view the crucial question and substantial issue, it is: How can it be best attained to carry out the intention of Con-

gress in passing these various acts with respect to social security of employees, whether they be engaged as transportation units in interstate commerce activities, or whether they be general employees engaged in other lines of industry which are covered by social security legislation? Both counsel, in their respective briefs, seem to take that position. In plaintiff's opening brief the following excerpt is found:

"The several acts referred to (The Carriers' Taxing Act of 1937 [45 U.S.C.A. §§ 261–273] ; The Railroad Retirement Act [45 U.S.C.A. § 228a et seq.] ; and The Railroad Unemployment Insurance Act [45 U.S.C.A. § 351 et seq.]) are, therefore, related to the extent that each forms a part of the national system of social security and unemployment relief."

And defendant's counsel in his brief states substantially the following:

"Congress formulated and created a special and separate social security system for the railroad industry. The Carriers' Taxing Act is the means whereby the social security system for the railroads is financed."

So I think we may conclude that the relative status of the railroad security legislation is that of an integral part of the whole social security system, and that the separate part for the railroad industry in the larger system with which we are concerned in this action was an attempt to attain objectives of efficiency and simplification in so far as the railroad industry was concerned. This poses one of the crucial questions of the case, which may be stated:

Is the plaintiff a "company" within the meaning of the federal acts?

That issue, of course, is dependent, first, upon the plain language that the statute itself has used in enactments which are applicable in the case, and second, on judicial construction of the acts and of other social security legislation.

Section 1532(g), found in 26 U.S.C.A. Int.Rev.Code, defines a company as follows:

"The term 'company' includes corporations, associations, and joint-stock companies."

There is a connotation from these words that there are two classifications: There are what may be called, for lack of a better term, legal entities, structures which are the creatures of the law, and other entities which are not expressly created by statute or by written law, but which are legal entities in the sense that they are aggregations of individuals or of other entities which can be called associations. There, I think, is a clear line of demarcation indicated by the words of the statute itself, which signify that Congress intended to so classify these different entities, and not restrict them to legally created entities. By legally created entities I mean entities that come into being solely because of municipal law, solely because of written, expressed legislative enactment; but there may be entities, associations, that are not so formulated, but which arise because of a voluntary agreement between individuals or between other entities.

The Supreme Court of the United States, in a case cited by both parties, Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 292, 80 L.Ed. 263, while an income tax case, contains language which I think is helpful in ascertaining the intention of Congress, and the meaning of words which have been used by Congress in these Acts relative to carriers. In this case it is stated:

" * * * and we referred to several definitions found in standard dictionaries, as, e. g., 'a body of persons united without a charter, but upon methods and forms used by incorporated bodies for the prosecution of some common enterprise'; 'a body of persons organized for the prosecution of some purpose, without a charter, but having the general form and mode of procedure of a corporation'; 'an organized but unchartered body analogous to but distinguished from a corporation.' * * * 'Association' implies associates. It implies the entering into a joint enterprise, and, as the applicable regulation imports, an enterprise for the transaction of business."

What is there in the statute or the regulation involved in our problem that should differentiate the association under consideration here from those which were considered by the Supreme Court in the Morrissey case? I don't think there are any features, except one feature which I will discuss later, in so far as the applicability of common law principles are concerned in attempting to ascertain the status of the bus company. I use that term for brevity.

In the Stipulation of Facts there is an agreement that the Pacific Electric Railway Company and the Los Angeles Railway Company were associated in a joint venture, and that the operation was to be considered as constituting a joint department. How can a joint department be anything than an entity that consists of the unity of two persons, of two beings, and if that is the case, is it anything but an association within the meaning defined by the Supreme Court in the Morrissey case, and also found in lexicographies, by taking the common understanding of the term as we find it in the dictionary? The only possible legal objection to that conclusion would be that it might infringe what we understand to be the common law definition of an agency, but I think there are some decisions of the Federal Appellate Courts which throw light on that and remove that feature from the case in so far as construing the statutes involved here are concerned.

The case of the United States v. Vogue, Inc., 145 F.2d 609, 612, which was an appeal in the Fourth Circuit, involving social security impositions and exactions, while it did not involve precisely the question we have here, it did involve social security legislation, and Judge Parker, in the course of the opinion of the court, which I think was an unanimous opinion, stated:

"Common law rules as to distinctions between servants and independent contractors throw but little light on the question involved. The Social Security Act, like the Fair Labor Standards Act * * *, and the National Labor Relations Act * * *, was enacted pursuant to a public policy unknown to the common law; and its applicability is to be judged rather from the purposes that Congress had in mind than from common law rules worked out for determining tort liability."

And further on in that same decision the court observed:

"We are dealing, however, with a specific statute which, like the National Labor Relations Act * * *, is of a class of regulatory statutes designed to implement a public, social, or economic policy through remedies not only unknown to common law but often in derogation of it. * * * If the Act presently considered, expressly or by necessary implication, brings within the scope of its remedial

and regulatory provisions, workers in the status here involved, we are not concerned with the question whether a master-servant relationship exists under otherwise applicable rules of the common law."

Except that they discuss common law principles for tort liability, respondeat superior, or any of those other common law rules concerning principal and agent, we get little light in elucidating the intention of Congress in passing legislation of the type in controversy. That is also forcefully, I think, illustrated by the recent decision of the Supreme Court in National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, which is a case with which we are all familiar, which originated here in the city with respect to newsboys as to what their classification should properly be under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. and in that case the court held that for the meaning of the term "employee" for the purpose of the National Labor Relations Act, common law principles were not to be the exclusive standard to be used for the determination of the question and that the purpose of the legislation was to be the factor affecting the solution of the problem.

So I think the polestar or the chart which we might adopt for the purpose of arriving at what Congress meant in these statutes has been pretty well clarified for us by the Appellate Court decisions in the federal system.

The court therefore finds that the Pacific Electric Railway Company is not an employer within the federal act, in so far as the operation of the Los Angeles Motor Coach Lines is concerned because the Los Angeles Motor Coach Lines is itself a company.

The statute under consideration, to-wit, the statute found in 26 U.S.C.A. Int.Rev. Code, § 1532 et seq., expressly provides that a "company" may be an association; that, although according to common law principles of the law of Agency, the Los Angeles Motor Coach Lines may be deemed merely an agency of the plaintiff, yet those principles are not controlling where for them to be applied would defeat the intention of Congress. In this case to find that the Pacific Electric Railway and the Los Angeles Motor Coach Lines are one and the same legal entity for the purpose of this legislation would not be in accord with the intention of Congress be-

cause such a finding would include within the separate and special social security system provided for the railroad industry, a motor carrier.

Later on I shall discuss a case which I think clearly differentiates between the legislation with respect to buses and steam railroads and interstate activities or transportation by rail. If this conclusion with respect to the characteristics of the Motor Coach Lines is correct, and I find that it is correct in this action, then a second question perhaps is posed, which may be stated succinctly as follows: Under that term, is the plaintiff in this case a carrier which directly or indirectly controls a company which operates a facility or performs a service in connection with the transportation of passengers or property by railroad?

That is the second aspect of the statute under consideration which requires interpretation and decision in this action under the pleadings. So that we may summarize the two crucial questions in so far as the applicability of the statutes cited is concerned in this case as being twofold and conjunctive in their aspects. For one to be an employer within the meaning of this section one must be a carrier in interstate commerce and, firstly, directly or indirectly control a company which, secondly, operates a facility or performs a service in connection with the transportation of passengers or property by railroad.

There are two cases in the Federal Appellate Courts that illustrate that rule. The facts are different, but I think the principle is well reasoned in both of the cases, and it seems to me they are helpful in the determination of the issue before the court in this action.

In Allen v. Ocean S. S. Co. of Savannah, 5 Cir., 123 F.2d 469, 470, which was a case involving a steamship company, the facts of the case were different than those here, because there were two corporate entities which formed the association. Here, of course, we have two corporate entities, but only one of them engaged in interstate activity, the other essentially and wholly in intrastate activities. The court, in commenting on the situation that existed in that case, and I think also in discussing the question that appears in the instant case as to the conflicting attitude of governmental agencies in respect to the same activity, and in the clarifying and interpretation of statutes such as those involved in this action, used this language:

"More it is a strong argument for giving the statute a broad common-sense construction rather than a narrow one, sounding in mere logomachy. We therefore approach a decision of the question, with the serenity born of the knowledge that for a decision on merely logomachic grounds, reasons have been and may again be advanced for either construction, and with a determination born of that same knowledge to decide the question on broader considerations than some of the purely legalistic ones advanced, in the lengthy opinions of the counsel for the two bureaus, and in the brief the commissioner has filed here."

And the same court further on in the case states:

"We find it important only to determine whether upon a consideration of the language of the invoked act in the light of its regulations to the Special System of Social Security for the railroad industry, and the relation of that system to the System of Social Security as a whole, they more reasonably support the view urged upon us by appellant or that urged by appellee."

The court finally expresses the opinion that the fact that a steamship company would be included within a part of the social security system intended only for railroads was enough in itself to prevent the court from adopting a construction that it was within the provisions of the railroad social security act.

I think that case illustrates the factors that precipitated the controversy which brings this action before the court, because, as I shall later discuss, these contrary views expressed by administrative agencies were probably the situation that was presented in the appeal to the court in the Fifth Circuit.

The second case which I think is helpful at this time which is also a steamship case, and is also distinguishable on the character of the entities, is Magruder v. Baltimore Steam Packet Co., 4 Cir., 144 F.2d 130, 134. In this case the court adopted the views expressed in Allen v. Ocean S. S. Company of Savannah, and denied that the steamship company was an employer within the purview of the social security legislation intended for railroads, and in the course of its opinion stated this:

"Certainly the Congressional intent to include water carriers cannot be drawn from the fact, if it be a fact, which appellant makes so much of, that water carriers, in addition to performing purely steamship services, perform for a charge and for themselves, transportation service which the railroad carriers could have undertaken but left to the water carriers to perform. For, if this were. the simple criterion, Congress could easily and it would have said so, instead, as it did, of confining the application of the act to rail carriers and companies owned by them which performed a part of their transportation service for them."

Now, isn't that applicable here? Not only do I think it is, but another court of coordinate authority has expressed the same view with respect to buses and coaches, which I will cite later.

 There is in the Baltimore Steam Packet case another very cogent reason, I think, for interpreting the statute in the manner indicated by the court, and that appears with respect to a quotation concerning the debate which occurred in Congress at the time of the passage of the Carriers' Taxing Act, 45 U.S.C.A. § 261 et seq. I don't want to be understood as saying that a court should take the debates of Congress and the expressions of the legislators as to their understanding of the statute as a cardinal rule of interpretation. It is true that where there are committee reports of Congress, we may use those reports in endeavoring to judicially ascertain what Congress meant in passing the statute, where there is some question as to their intention, but they do throw some light on the problem, enough for a court of superior authority, the Circuit Court of Appeals of the Fourth Circuit, to put it in the record of the appeal. I think I should read this into the record here so that the record as made up will contain. a complete statement of the views of this court as to the proper construction to be applied, especially in view of the fact that these governmental agencies are just as desirous as the court is to arrive at a proper construction of the statute, so that they will understand that the court has given due deference to their views, but thinks that some of those are erroneous. The decision says:

"In explaining that bus lines * * * were not brought under the provisions of the act, Mr. Harrison used language showing very clearly that it was not intended to cover such corporations as this carrier owned steamship company."

The following colloquy occurred at the hearing on the measure before it was enacted into law; the hearings were before the Senate committee:

"Senator Brown. 'The Boston & Maine in New Hampshire has a bus company. The passengers on those buses get railroad tickets, and the buses are coordinated with the railroad line.' * * *

"Mr. Harrison. 'Yes.'

"Senator Brown. 'Do you think that the employees of that bus line would come under the provisions of this bill?'

"Mr. Harrison. 'No; those employees would not. You see, when you get into the field of bus transportation, you have not only the subsidiary corporations of the railroads, but you have many privately-owned bus companies. And in this instance we have proceeded with the thought that we had better not try to invade the motor transportation field, but that we had better restrict ourselves to the railroad industry.' "

If the Circuit Court of Appeals had a right to use that colloquy as an aid to the court in the judicial determination of the meaning of an act, certainly this court has a right to do so.

There is one case which I think comes very close to a parallel of the case before the court. While it is a district court decision, I think it is not only persuasive but it is written with the same philosophy as this federal appellate decision I have cited, and which is logical, in my judgment, and a correct interpretation of the situation before this court. That is the case of Interstate Transit Lines v. United States, a decision of the District Court in the State of Nebraska, found in 56 F.Supp. 332, 333. The only difference there that I can see was that the bus line was a corporate entity. In that case the bus lines had paid a tax under the provisions of the Carriers' Taxing Act of 1937. It sought the return of the amount paid. The entire stock of the bus corporation was acquired by a railroad corporation. This stock ownership by the railroad corporation was used as the basis of the taxation in question. In declaring that the plaintiff was entitled to a return of the taxes paid on the ground that it was not within the provisions of the Railroad Social Security Act, the court said:

"We hold therefore that the bus service, in which plaintiff is engaged, is service in connection with the transportation of passengers or property by bus, rather than by railroad, and that any contact, connection or interchange of service between the railroads and the plaintiff are mere incidents to their business, and such as are practiced and engaged in by other lines of transportation. Having arrived at this conclusion, it is a simple matter to apply the law. The Act of Congress is simple in language and should be easily and readily understood. The meaning of the word 'employer', as the word is used in the Act, is defined, and this word pertains only in connection with the transportation of passengers or property by railroad, within the meaning of Section 1(a) of the Carriers' Taxing Act of 1937."

That is the same language used in the statute that I have cited from United States Codes Annotated. The court continues:

"We think the language of the act is sufficiently clear to indicate the intention of Congress to exclude the plaintiff and all other similar bus lines from the operation of the act, but notwithstanding the record abounds with evidence of the deliberations of the Congress leading up to the passage of the act, and if such proceedings are to be resorted to as an aid in interpreting the law, then we may say from these proceedings it can only be concluded that motor bus transportation was excluded from the act deliberately, purposefully and intentionally."

In the record before us we have at least three further decisions on questions which are closely related to the problem here. There is introduced in the case as Plaintiff's Exhibit 5 a decision of the California Department of Employment on Appeal before the California Employment Commission, together with findings of fact. This proceeding involved the entities before us. It is in the very environment in which this case exists, and pertains to one of the employees, and it was necessary, in the determination of the rights of the claimant and appellant, Ned W. Shafer, for that body to determine what was, in its opinion, the status of the Los Angeles Motor Coach Company. It is in the record; I will not read it all, but a portion of the decision I think should be quoted:

"It is clear that the operations and services of the Coach Company are of a local nature, entirely intrastate and not connected with nor facilitating in any manner interstate commerce or the operations of any steam railroad. Although it is true that the Interstate Commerce Commission held that the Pacific Electric Railway Company was subject to the provisions of the Railway Labor Act, it does not necessarily follow that the operations of the Coach Company are likewise subject to either the Railway Labor Act, the Federal Railroad Retirement Act, or the Railroad Unemployment Insurance Act. That issue was not presented to the Interstate Commerce Commission for a decision.

"The evidence supports the fact that the Coach Company is a separate and distinct entity that has no connection with the Pacific Electric Railway Company. The Brotherhood of Railway Trainmen has been considered the collective bargaining agent for the employees of the Pacific Electric Railway Company and that company, in trade disputes which have heretofore existed, has asked that the National Mediation Board intervene, which it did. However, with respect to the operations of the Coach Company, the Pacific Electric Company has refused to recognize the Brotherhood of Railway Trainmen as the collective bargaining agent for the Coach Company employees. The dispute which arose as to the proper collective bargaining agent for the employees of the Coach Company was handled by the National Labor Relations Board. If it were true, as contended by the Pacific Electric Railway Company, that the Coach Company is subject to the Railway Labor Act, the Railroad Retirement Act, or the Railroad Unemployment Insurance Act, the dispute which arose as to the collective bargaining agent would have been brought before the National Mediation Board."

I am citing that to show just what it does show—the reasons which actuated this Board. I am not citing it as the conclusion which this court might reach on a similar question of law, if it were presented here, with respect to the identity of these different governmental agencies, concerning labor disputes. That Commission continues:

"In view of this decision, it is quite apparent that these agencies are mutually exclusive. Therefore, as the National Labor Relations Board has assumed jurisdiction of the controversy regarding the proper collective bargaining agent, it lends great weight to our decision that the last employer is an 'employing unit' subject

to the provisions of the California Unemployment Insurance Act.

"In addition, the evidence discloses that the employees of the Coach Company are protected under the California Workmen's Compensation Act. If they were employed by an 'employer' or 'carrier' subject to the Federal Acts regulating federal employees, operations, and workmen's compensation, these workers would be protected under the Federal Employers' Liability Act. Further the operations of the Coach Company have been approved by the California Railroad Commission rather than by the Interstate Commerce Commission.

"For the reasons set forth above, we conclude that the Los Angeles Coach Company is an employing unit subject to the provisions of the California Unemployment Insurance Act."

Now, we do also have a judicial determination of the issues which are at least indirectly before this court in this action. In Plaintiff's Exhibit No. 7 in this case we have several cases in the Superior Court of the State of California in and for the County of Los Angeles, which involve claims made by various workers. It is not necessary to read into the record the full designation of the proceeding. The same conclusion was reached by the court there, and after a recital of the facts in formal findings which I shall not read, the following conclusions of law were made by the Superior Court of the State:

"I. That the Los Angeles Motor Coach Lines, also known as the Los Angeles Motor Coach Company, was during all of the periods involved in these suits an entity separate and distinct from the Los Angeles Railway Corporation and Pacific Electric Railway Company.

"II. That the said Los Angeles Motor Coach Lines was during all of the periods involved in these suits an employer within the provisions of Section 9 of the California Unemployment Insurance Act."

"IV. That the persons working for the Los Angeles Motor Coach Lines, also known as Los Angeles Motor Coach Company, during all of the periods involved in these suits were employees of that entity and the amounts reported as wages by plaintiffs and credited by the Department of Employment under Account Number 41–9422 on account of said employees and remittances paid thereon were correctly credited by the California Department of Employment pursuant to the provisions of the California Unemployment Insurance Act.

"V. That the said Los Angeles Motor Coach Lines is not, and at no time has been, within the exemptions of Section 7.5 of the California Unemployment Insurance Act, and is now and at all times has been subject to the California Unemployment Insurance Act, and is not and at no time has been subject to the Railroad Unemployment Insurance Act."

Parenthetically, that regulation or statute exempts these employees from that Act, and that was the provision referred to by the finding of the Superior Court. I will not read the other findings, because it is not necessary.

The federal government also has taken a position which substantiates that view; that is, a branch of the federal government. It is there where the conflict comes between two agencies of the federal government. In Plaintiff's Exhibit 6, which relates to the claim of the claimants Katherine B. Garlow and Richard Floyd Garlow and Floyd C. Garlow, wage earner, the Appeals Council of the Social Security Board rendered an illuminating opinion which I think is very carefully stated and logically reasoned, and justly so, and a portion of that finding should be included in the record here. I will not read it all.

"Prior to January 1, 1940, employment was defined in Title II of the Social Security Act as 'any service of whatever nature performed within the United States by an employee for his employer,' with certain exceptions, the only one material here being service performed by an individual as an 'employee' as defined in Section 1(b) of the Railroad Retirement Act, (section 210b, as amended by Section 17 of the Railroad Retirement Act of 1937.) Social Security Board Regulation No. 2, issued under this Act, defined an 'employer' as 'an individual, a corporation, a partnership, a trust or estate, a joint stock company, an association or a syndicate, group, pool, joint venture or other unincorporated organization, group, or entity.' This regulation had been in effect for over two years at the time of the enactment of the Social Security Act amendments of 1939. As amended in 1939, the Social Security Act provides so far as material here (Section 209(b)) that the term 'employment' means 'any service of whatever nature, performed after December 31, 1939, by an employee for the person employing him * * * ex-

cept \* \* \* service performed by an individual as an employee or employee representative as defined in Section 1532 of the Internal Revenue Code.' Section 1 of the Carriers' Taxing Act, paragraphs (a) and (b) are, so far as material here, identical with paragraphs (a) and (b) of Section 1 of the Railroad Retirement Act. Section 1101(a) (3) provides that 'the term "person" means an individual in a trust, or estate, a partnership or corporation.' "

"The only change in the definition of 'employment' made by the 1939 Amendments which is material here was substitution of the words 'for the person employing him' for 'for his employer.' That this change was not intended as a change in substance but was a change in form only, is shown by the regulations issued under the amended Act. Those regulations (regulations No. 3) provide in part as follows:

" 'Section 403.804'

" 'Every individual is an employee if the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.'

"By Section 403.805 an employer is defined as 'an individual, a corporation, a partnership, a trust, an estate, a joint stock company, an association, or a syndicate, group, pool, joint venture or other unincorporated organization, group, or entity.'

"In view of this legislative history, it is immaterial that the deceased wage earner's services were performed before January 1, 1940, and we will consider the question presented as if the provisions of the present law had been in effect since January 1, 1937.

"While it appears that the Motor Coach Company has most of the characteristics of a partnership or joint venture, we do not believe that it is necessary to decide that it is either a partnership or a joint venture because we are satisfied that it is an unincorporated organization or group and therefore an employer within the meaning of the Social Security Act and the regulations issued pursuant to it.

"In construing these provisions, we must read the portion of Section 209(b) quoted above together with the portions of Regulations No. 3 above quoted. It then appears that employment means any service performed by an employee for an individual, a corporation, a partnership, a trust or estate, a joint stock company, an association or a syndicate, group, pool, joint venture or other unincorporated organization, group or entity. We believe that the purpose of the regulations was to make it clear that the 'employer' may be the individual, corporation, partnership, etc., conducting the business in the course of which the wage earner's services are performed, and that it is immaterial whether such business is conducted by a single individual or several, and if conducted by several, it is immaterial what form of organization they adopt for the purpose of carrying on the business. We believe, furthermore, that so construed the regulation is valid for the reasons stated in footnote 2."

That refers to the question of the filing of a bankruptcy petition in a partnership, as to whether it is meant that by so doing they intend to proceed against the individual partners as such.

As I say, I am not citing these administrative rulings as conclusions of this court, or, indeed, as to whether some of the deductions that are made in these rulings would be adopted by this court if the concrete problem they discuss in these rulings were presented to this court, but I am citing them to show the trend of the administrative decisions in both the state and federal systems. With one exception they have been uniform. This ruling of the Appeals Council of the Social Security Board, from which I have been reading, continues as follows:

"To reject this construction would render all of the regulation after the word 'corporation' surplusage since the parties to a partnership, joint venture, unincorporated organization or group are clearly individuals within the meaning of the regulations. The words 'unincorporated organization' and 'group' can be given effect only if they are construed to mean an unincorporated organization or group as distinguished from the parties thereto. For the purpose of determining whether services cover employment within the meaning of Title II of the Social Security Act, an unincorporated organization or group is a 'person' for whom services are performed distinct from the parties thereto."

Then the Appeals Council state as follows:

"We conclude, therefore, that for the purpose of determining whether the services of the deceased wage earner were 'employment' within the meaning of Title II of the Social Security Act, we may and do hold that he was employed by the Motor Coach

804

Company, a 'person' distinct, for the purposes of this act, from its constituent members.

"The only remaining question is whether the Motor Coach Company is an 'employer' within the meaning of Section 1(a) of the Railroad Retirement Act. It is not suggested that it is an express company, sleeping car company, or common carrier by railroad subject to Part I of the Interstate Commerce Act. The Motor Coach Company is engaged solely in operating passenger bus lines in the City of Los Angeles and the undisputed testimony is to the effect that it provides no shuttle service between railway stations or between railway and bus stations in the same terminal area, nor does it perform any baggage pick-up or delivery service in connection with any railroad. It is clear therefore that it performs no services in connection with the transportation of passengers or property by railroad, which would justify holding that it is an 'employer' within the meaning of Section 1(a) of the Railroad Retirement Act."

Then they conclude that the proper allocation of the fund was in the Social Security administrative unit instead of the Railroad Retirement unit.

The only contrary view is that expressed by the General Counsel of the Railroad Retirement Board in his communication to the executive officers of the Pacific Electric Railway Company, which is found in Plaintiff's Exhibit No. 11. I cannot agree with the conclusions which he reaches there, with due respect to it. I think it is carefully considered, but I do not believe it is the correct interpretation to take of the status of the Motor Coach Company. It seems to me that there would be less confusion if the views adopted by the other administrative agencies and by the Superior Court of Los Angeles County, and also as indicated by the decisions of the Federal Courts which I have cited, were adopted by this court. I think there would be more confusion, and there would be really a provocation of the difficulties these administrative agencies seem to encounter in endeavoring to ascertain who should control these funds, than by adopting the plan which the court has suggested as its conclusion in the case.

■ Under the decision which the court has announced, and in which it holds substantially that the allocation should have been under Title 2 of the Social Security Act, 42 U.S.C.A. § 401 et seq., instead of under the Carriers' Act, counsel can agree upon the form of judgment.